IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-161-FL

| | | |
|---|---|---|
| GREAT AMERICAN EMU COMPANY, LLC doing business as AEC Consumer Products, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| THE E.J. MCKERNAN CO. doing business as McKernan Packaging Clearing House, | ) ) ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 13). Also before the court is plaintiff's motion to strike (DE 21) improper argument in defendant's reply. The motions have been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted in part and denied in part, and plaintiff's motion is denied as moot.

## STATEMENT OF THE CASE

Plaintiff commenced this action on April 17, 2020, asserting North Carolina common law and statutory claims arising out of an alleged contract for the supply by defendant of 1.9 million bottles to plaintiff, for its use in bottling its hand sanitizer product. Plaintiff asserts the following claims: 1) breach of contract 2) fraudulent inducement to contract; 3) negligent misrepresentation; 4) breach of implied covenant of good faith and fair dealing; and 5) unfair and deceptive trade

practices under N.C. Gen. Stat. § 75-1.1 ("UDTPA"). Plaintiff seeks damages, including punitive, and statutory trebled damages, with costs, and attorney fees.

Defendant filed the instant motion to dismiss on June 15, 2020, on the basis that the complaint fails to state a claim upon which relief can be granted. Plaintiff responded in opposition on July 13, 2020, and defendant replied on July 28, 2020. Plaintiff filed the instant motion to strike improper argument in defendant's reply on July 31, 2020, and defendant responded in opposition to that motion on August 4, 2020.

STATEMENT OF THE FACTS

The facts alleged in the complaint may be summarized as follows.[1] Plaintiff is a company with principal place of business, in Fayetteville, North Carolina, engaged in manufacturing and sale of consumer products. It is a leading manufacturer of alcohol-free, fragrance-free, triclosan-free, water-based hand sanitizer, marketed under the label BAC-D® (hereinafter, plaintiff's "hand sanitizer"). Defendant is a company with principal place of business in Reno, Nevada. Prior to the alleged events described in this lawsuit, defendant supplied to plaintiff 1.7-ounce plastic bottles with a pump spray lid for its hand sanitizer product.

In anticipation of the exceptionally high demand for hand sanitizer as the COVID-19 virus spread across the world, plaintiff sought a stable and reliable source of large quantity of plastic bottles available immediately and at regular intervals thereafter. Plaintiff relies upon its ability to obtain plastic bottles quickly and reliably from suppliers such as defendant in order to meet consumer demands, most especially during the COVID-19 pandemic.

On March 10, 2020, plaintiff contacted defendant to discuss the continued availability of its supply of 1.7-ounce bottles and plaintiff's projected surge in consumer demand for plaintiff's

---

[1] For ease of reference, the court sets forth the factual allegations in the complaint largely without alteration.

2

hand sanitizer in the near future. This expected surge in consumer demand for plaintiff's hand sanitizer during the COVID-19 pandemic would necessitate a larger-than-usual supply of bottles on a predictable delivery schedule, which plaintiff communicated to defendant.

Defendant communicated to plaintiff that it did not have a sufficient supply to meet the expected demand with the 1.7-ounce bottles. Defendant then informed plaintiff that it had sufficient supply of a similar product—a two-ounce bottle—to meet plaintiff's expected surge in product demand. Plaintiff agreed with defendant that that the two-ounce bottle could serve as a suitable substitute for the 1.7-ounce bottles, and plaintiff calculated that it needed 1.9 million two-ounce bottles for the first month.

Defendant, by and through its assistant sales manager Maria Alexeeva ("Alexeeva") and its sales supervisor Ashlyn Ibia-Bronaugh ("Ibia-Bronaugh"), assured plaintiff that it had sufficient inventory and could completely supply plaintiff's requirement of 1.9 million two-ounce bottles and the corresponding pump spray lids over the course of four weeks. Defendant agreed to be an exclusive supplier to plaintiff of these 1.9 million bottles, to set aside that quantity of bottles specifically and solely to supply to plaintiff, and to deliver to plaintiff 480,000 bottles each week until a total of 1.9 million bottles had been delivered. In exchange for the exclusive and guaranteed availability and delivery of those bottles in weekly installments over the course of four weeks, plaintiff agreed to pay 50% of the total purchase price as a deposit immediately, to submit a credit application to defendant, and to pay the balance of the account "in accordance with industry standard NET30 terms." (Compl. ¶ 12). Defendant agreed to all of these terms.

As part of the exclusive supply agreement reached between the parties, plaintiff informed defendant that any failure to deliver the contracted goods on the promised delivery schedule would damage plaintiff in the form of lost profits due to an inability to continue its production and sales

3

efforts. According to the complaint, defendant was therefore fully aware of and accepted that failure to deliver the contracted goods at the scheduled intervals would damage plaintiff in the form of lost revenues and lost profits, and the inevitability of such damages in the event of a failure to timely supply all 1.9 million bottles was explicitly contemplated as part of the contract between the parties.

Defendant agreed that it had all of these bottles available so as to avoid any disruption in sales of plaintiff's hand sanitizer product, and defendant acknowledged its understanding that the timely supply of these bottles was essential to plaintiff's ability to meet an increase in demand for hand sanitizers like plaintiff's hand sanitizer in view of the developing COVID-19 pandemic. Defendant conveyed to plaintiff that it was ready, willing and able to supply the entire 1.9 million order of contracted bottles notwithstanding the increased market demand for such bottles caused by the COVID-19 pandemic. Based on the assurances of defendant, through Ibia-Bronaugh and Alexeeva, plaintiff adapted its manufacturing and bottling capabilities and updated its marketing materials to accommodate the change to the available two-ounce bottle size from defendant.

To memorialize the agreement reached between the parties, plaintiff submitted a purchase order (hereinafter, the "purchase order") to defendant on March 12, 2020, for 1,900,000 two-ounce plastic bottles and the corresponding 1.9 million pump spray lids. The agreed upon prices for these goods were $0.068 per two-ounce white bottle and $0.125 per white pump spray lid, for a total purchase order of $366,700.00. Said purchase order is attached as Exhibit A to the complaint. Plaintiff completed the 50% deposit payment to defendant via wire transfer executed on March 13, 2020, as depicted in a wire transfer confirmation attached as Exhibit B to the complaint. Plaintiff's president, Tammy Claussen ("Claussen"), contacted Alexeeva on March 13, 2020 to confirm the availability of the contracted goods as well as to confirm the agreed upon delivery schedule over

the agreed-upon four week period beginning with the first shipment scheduled on March 20, 2020. Defendant communicated to Claussen, as per emails attached as Exhibit C to the complaint, that defendant would ship 480,000 of the contracted goods on each of the following dates: March 20, 2020; March 27, 2020; April 3, 2020; and defendant would ship the balance of the total order of 1.9 million units, or 460,000 contracted goods, on April 13, 2020.

As of the date of filing of the complaint, defendant has never sent a full shipment of the contracted goods as agreed upon by the parties. At that time, defendant had only made partial deliveries of the contracted goods, never a full delivery of the contracted goods, and approximately one-half of the contracted goods were undelivered despite defendant's earlier assurances that all contracted goods were available and would be delivered within the first month after the purchase order. Plaintiff became concerned by April 3, 2020, when defendant had failed to provide any full shipments as promised and continued to fall behind on delivery of the contracted goods.

Plaintiff reached out to defendant's general manager, Jim Lemmons ("Lemmons"), who allegedly falsely claimed that plaintiff did not have any priority rights in the contracted goods and stated that defendant was choosing to fulfill orders from other customers first ahead of plaintiff. Plaintiff has not received the third or fourth deliveries of the contracted goods and is owed the outstanding delivery of these missing goods.

In subsequent conversations, defendant allegedly informed plaintiff that for an additional price above the price already agreed upon by the parties, defendant would ship to plaintiff the remainder of the contracted goods for which plaintiff had already paid valuable consideration to guarantee availability and delivery within a four-week period. According to the complaint, defendant is "profiteering from the increased demand for the contracted goods in the COVID-19 pandemic by withholding deliveries previously guaranteed" to plaintiff under an existing exclusive

supply contract to instead sell the contracted goods to other customers at a significantly inflated price. (Id. ¶ 20). Alternatively, according to the complaint, if defendant is not profiteering by selling these bottles to third parties at inflated prices, then defendant allegedly falsely promised that it had the available inventory of the contracted goods to fulfill plaintiff's entire order for 1.9 million contracted goods. According to the complaint, "[d]efendant knew or should have known that it was unable to meet this demand, but [d]efendant made the false promises regardless in order to wrongly secure [plaintiff's] substantial deposit." (Id. ¶ 21).

In alleged reliance upon defendant's allegedly false promises that it would and definitively could timely deliver the 1.9 million bottles needed by plaintiff, plaintiff did not look for any alternative or backup supplier of bottles for its hand sanitizer. Given the present overwhelming market demand for such bottles, plaintiff is unable to find any alternative supplier. Due to defendant's failure to deliver the contracted goods within the agreed-upon period, plaintiff has had to stop production of its hand sanitizer and stop taking orders from customers during a period of exceptionally high demand due to the COVID-19 pandemic.

Defendant's failure to deliver the contracted goods allegedly is causing plaintiff to suffer substantial damages in the form of lost profits and revenue, lost customer good will, and harm to its business reputation, and other losses. Plaintiff specifically informed defendant at the time of the contract formation that these types of losses would be incurred if defendant did not timely fulfill plaintiff's need for these bottles, and defendant assured plaintiff of its ability to timely supply all 1.9 million bottles. Plaintiff relied on these assurances in entering into a supply contract with defendant. Defendant allegedly knew or reasonably should have known that plaintiff would suffer damages in the form of lost profits and revenue, lost customer good will, and harm to plaintiff's

business reputation if defendant failed to deliver the contracted goods within the agreed-upon time period.

## COURT'S DISCUSSION

A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

B.    Analysis

1.    Breach of Contract

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted).  A contract, express or implied, requires mutual assent, mutuality of promises, and definite terms.  See Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961). "Mutual assent is normally established by an offer by one party and an acceptance by the other, which offer and acceptance are essential elements of a contract." Creech v. Melnik, 347 N.C. 520, 527 (1998).

7

"Mutuality of promises means that promises, to be enforceable, must each impose a legal liability upon the promisor. Each promise then becomes a consideration for the other." Wellington-Sears & Co. v. Dize Awning & Tent Co., 196 N.C. 748, 751 (1929). "For an agreement to constitute a valid contract, the parties 'minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.'" Chappell v. Roth, 353 N.C. 690, 692 (2001) (quoting Boyce v. McMahan, 285 N.C. 730, 734 (1974)). "To be binding, the terms of a contract must be definite and certain or capable of being made so." Horton, 255 N.C. at 679 (quoting Williamson v. Miller, 231 N.C. 722, 728 (1950)).

Here, plaintiff sufficiently has alleged the existence of a valid contract between the parties, and the breach of the terms of that contract. In particular, on March 10, 2020, "[d]efendant agreed to be an exclusive supplier to [plaintiff] of [the] 1.9 million bottles, to set aside that quantity of bottles specifically and solely to supply to [plaintiff], and to deliver to [plaintiff] 480,000 bottles each week until a total of 1.9 million bottles had been delivered." (Compl. ¶ 12). "In exchange for the exclusive and guaranteed availability and delivery of those bottles in weekly installments over the course of four weeks, [plaintiff] agreed to pay fifty percent . . . of the total purchase price as a deposit immediately, to submit a credit application to [d]efendant, and to pay the balance of the account in accordance with industry standard NET30 terms." (Id.). "Defendant agreed to all of these terms." (Id.).

Further, "[t]o memorialize the agreement reached between the parties, [plaintiff] submitted [the] purchase order to [d]efendant on March 12, 2020, for 1,900,000 two-ounce plastic bottles . . . . for a total purchase order of $366,700.00." (Id. ¶ 15). Plaintiff completed the 50% deposit

payment on March 13, 2020, and plaintiff confirmed the agreed upon delivery schedule as per the Claussen emails on March 13, 2020. (Id. ¶¶ 16-17).

Where it is alleged that defendant agreed to all the foregoing terms, plaintiff has pleaded facts permitting an inference that the parties entered into a valid contract, comprising an oral contract whose terms were evidenced by the purchase order, the wire transfer, and Claussen emails. See, e.g., Gen. Tire & Rubber Co. v. Distributors, Inc., 253 N.C. 459, 468–69, 117 S.E.2d 479, 486–87 (1960) ("The original contract between the parties was partly written and partly oral. It consisted of the parol agreement making defendant exclusive distributor of the floor covering products in the Carolinas, and the written 'Warehouse Agreement' arranging credit."). In addition, plaintiff alleges a breach of these terms where "[d]efendant has never sent a full shipment of the contracted goods as agreed upon by the parties." (Id. ¶ 18). In sum, the complaint satisfies the minimal requirements to state a claim for breach of contract.

Defendant argues nonetheless that plaintiff fails to state a claim for breach of contract because the purchase order made reference to in the complaint does not contain the same terms as the contract alleged in the complaint. In particular, the purchase order only contains the total quantity of 1,900,000 bottles, the total price of $366,700.00, and no terms for weekly shipments. Thus, defendant argues, where the exhibit to the complaint conflicts with the allegations of the complaint, the exhibit governs.

Plaintiff, however, does not allege in the complaint that the purchase order alone constitutes the contract between the parties. Rather, plaintiff alleges that the parties reached a firm and definite agreement, including four weekly shipments, and that "[d]efendant agreed to all of these terms." (Compl. ¶ 12). According to the complaint, "[t]his was an oral contract, the terms of which are evidenced by the [p]urchase [o]rder," the wire transfer confirmation, and the emails of Claussen.

9

(Id. ¶ 28). Moreover, there is not a definite conflict between the purchase order and the alleged terms of the contract in the complaint, where plaintiff alleges the purchase order comprises one component of the documents confirming the contract. (Id. ¶¶ 12, 15, 16).

Defendant cites Garner Lumber Co. v. Randolph E. Valensi, Lange, Inc., 393 F. Supp. 161, 162 (W.D.N.C. 1974), for the proposition that where a purchase order such as that attached to the complaint exists, the contract is written, not oral. In that case, however, the court did not have occasion to address any allegation of an alleged firm and definite oral contract to which the defendant expressly agreed, as is alleged here. (See Compl. ¶12). There is no discussion in Garner Lumber Co. of the relationship of the purchase order in that case to any alleged oral contract. See 393 F. Supp. at 161-163. Moreover, that case was decided upon summary judgment determination and findings and conclusions regarding the enforceability of an arbitration clause in the purchase agreement requiring arbitration in New York. See id. at 162. The only law cited is that of the Federal Arbitration Act. See id. at 163. Therefore, Garner Lumber Co. is inapposite.

Defendant also argues that the claim, as asserted, "would be barred by the statute of frauds, N.C. Gen. Stat. § 25-201-1 [sic]." (Reply (DE 20) at 2). This argument, however, raises a potential defense to the claim, not suitable for resolution on the face of the allegations in the complaint. While § 25-2-201 provides that "a contract for the sale of goods . . . is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties," it also provides that "[b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements" of the statute of frauds. N.C. Gen. Stat. § 25-2-201(1) & (2).

10

At this juncture, plaintiff has alleged facts sufficient to establish a valid contract for the sale of goods, confirmed by subsequent writings in the form of the purchase order, the wire transfer, and the Claussen emails. The court leaves for another day on a more complete record examination of the evidence regarding contract formation in light of statute of frauds requirements.[2]

In sum, defendant's motion to dismiss plaintiff's breach of contract claim is denied.

2.      Unjust Enrichment

Defendant argues that plaintiff cannot seek relief based upon unjust enrichment where plaintiff has asserted a breach of contract claim. In the complaint, plaintiff does not assert an independent claim of unjust enrichment, but rather asserts that defendant was "unjustly enriched by reason of its breach of contract." (Compl. ¶ 31).

"The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." Krawiec v. Manly, 370 N.C. 602, 615 (2018). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party, and the benefit must not be gratuitous and it must be measurable." Id. (quotations omitted). "A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554 (1988). Accordingly, "[i]f there is a contract between the parties the contract governs the claim and the law will not imply a contract." Id.

Plaintiff's assertion of a right to recovery because "[d]efendant has been unjustly enriched by reason of its breach of contract" (Compl. ¶ 31) does not state a claim of unjust enrichment as a

_____

[2]      Because defendant's argument asserted in reply does not impact the court's decision on the instant motion, the court DENIES AS MOOT plaintiff's motion to strike the reply.

matter of law because the assertion is based expressly on a breach of contract. Where a breach of contract is asserted, the contract governs the claim and the law does not permit assertion of an unjust enrichment claim on the same basis. While plaintiff suggests in its brief that it may assert a claim of unjust enrichment in the alternative, plaintiff has not pleaded in the complaint a claim of unjust enrichment in the alternative, but rather one expressly based upon breach of contract. (See Compl. ¶ 31). Accordingly, defendant's motion to dismiss plaintiff's assertion of unjust enrichment as an independent claim is granted.

       3.      Fraudulent Inducement

Plaintiff claims that defendant induced plaintiff to enter into the alleged contract and make payment in advance, by making the allegedly "false promise to [plaintiff] that [d]efendant could deliver and intended to deliver a total supply of 1.9 million contracted goods over a four-week period in increments of 480,000 . . . notwithstanding the COVID-19 pandemic," (Compl. ¶ 34), and by allegedly "fraudulently fail[ing] to disclose to [plaintiff] that it could not or would not supply the bottles guaranteed to [plaintiff]." (Compl. ¶ 38). For the following reasons, plaintiff has not alleged sufficient facts to state a claim of fraudulent inducement on this basis.

"The elements of fraud are: (1) the defendant's false representation of a past or existing fact, (2) defendant's knowledge that the representation was false when made or it was made recklessly without any knowledge of its truth and as a positive assertion, (3) defendant made the false representation with the intent it be relied on by the plaintiff, and (4) the plaintiff was injured by reasonably relying on the false representation." Britt v. Britt, 320 N.C. 573, 579 (1987). "Evidence of a promise which is not fulfilled is not sufficient to support a finding of a false representation unless the evidence shows the promisor made the promise with no intention of

fulfilling it." Id. "Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent." Id. at 580.

To state a claim for fraud on the basis of an unfulfilled promise, a complaint must allege "with sufficient particularity facts from which legal fraud arises or, where proof of actual fraud is necessary to relief, specifically alleges the fraud—that is, the fraudulent intent—and particularizes the acts complained of as fraudulent so that the court may judge whether they are at least prima facie of that character." Hoyle v. Bagby, 253 N.C. 778, 781 (1961). "[T]o be fraudulent the intent not to [perform] must have existed in the defendant's mind at the time he made the promise which induced the plaintiff" to act. Id.

In this case, plaintiff has not alleged facts permitting a plausible inference that defendant knew the alleged promise was false at the time it was made, or intended to not honor the promise at the time it was made. Rather, the complaint alleges only the fact of the alleged promise to supply the bottles and the fact that defendant failed to perform as promised.

For example, plaintiff alleges that, on March 10, 2020, Alexeeva and Ibia-Bronaugh, on behalf of defendant, "assured [plaintiff] that it had sufficient inventory and could completely supply [plaintiff's] requirement of 1.9 million two-ounce bottles and the corresponding pump spray lids over the course of four weeks." (Compl. ¶ 12). Plaintiff also alleges that plaintiff informed defendant "that any failure to deliver the contracted goods on the promised delivery schedule would damage" plaintiff, and that defendant again assured plaintiff "that it had all of these bottles available so as to avoid any disruption in sales" of plaintiff's hand sanitizer. (Compl. ¶ 13). There are no facts alleged in conjunction with these allegations, however, permitting an inference that defendant knew at the time that it could not perform as promised, or that it intended at that time not to perform as promised.

Allegations that defendant later failed to send a full shipment as agreed upon by the parties (see id. ¶18), or later stated that it "was choosing to fulfill orders from other customers first," (id.), or that "[i]n subsequent conversations, [d]efendant informed [plaintiff] that for an additional price" defendant would ship the remainder, (id. ¶ 19), are insufficient to establish fraudulent knowledge or intent at the time of contract formation. Rather, they are evidence only of "a promise which is not fulfilled," or "proof of nonperformance." Britt, 320 N.C. at 579-580.

Likewise, plaintiff's allegation that "[d]efendant is profiteering from the increased demand for the contracted goods in the COVID-19 pandemic by withholding deliveries previously guaranteed to [plaintiff] . . . to instead sell the contracted goods to other customers at a significantly inflated price," (Compl. ¶ 20), does not permit an inference of fraudulent intent or knowledge at the time the contract was formed. Rather, the allegation permits an inference only of defendant's intent after the formation of the alleged contract.

Further, plaintiff may not rest upon the conclusory assertion that "[d]efendant knew or should have known that it was unable to meet [the] demand, but [d]efendant made the false promises regardless in order to wrongly secure [plaintiff's] substantial deposit." (Compl. ¶ 21) (emphasis added). Similar conclusory allegations are that "[d]efendant never intended to supply the 1.9 million contracted goods within four weeks of the purchase order," and "[d]efendant intended to take [plaintiff's] substantial deposit for an exclusive supply assignment and then wrongfully sell that exclusive supply of products to other customers at a marked up price, thereby profiteering during a pandemic." (Id. ¶36) (emphasis added). Absent specific factual allegations permitting a plausible inference of knowledge or fraudulent intent, the court need not accept such "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual

14

enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." <u>Nemet Chevrolet, Ltd.</u> 591 F.3d at 255 (quotations omitted).

Plaintiff argues that <u>Wilar Enterprises, L.L.C. v. Websourced, Inc.</u>, No. 5:05-CV-384-H(2), 2005 WL 8159397, at \*3 (E.D.N.C. Nov. 3, 2005), where the court allowed both breach of contract claims and fraud claims to proceed, is analogous. That case, however, was decided in accordance with an obsolete pleading standard under which "motions to dismiss are granted only where the plaintiff can prove no set of facts which would entitle her to relief." <u>Id.</u> at \* 2. <u>Twombly</u> put to rest that standard in favor of a requirement that the complaint contain "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 569. In addition, the court in <u>Wilar</u> credited conclusory allegations in examining the intent or knowledge element of a fraud claim, accepting assertions in the complaint that the defendant "<u>fraudulently</u> misrepresented its ability and capacity," and that the defendant's "<u>fraudulent</u> misrepresentations of material facts . . . were reasonably calculated to deceive [the plaintiff] and were made <u>with the intent to deceive</u> [plaintiff] into entering the [contract]." 2005 WL 8159397 at \*3 (emphasis added).

In this case, by contrast, for the reasons stated above, plaintiff fails to allege enough facts to state the element of intent or knowledge required for a fraud claim. Plaintiff's reliance on conclusory assertions of intent and knowledge are insufficient to support the claim under the present standard for pleading as set forth in <u>Iqbal</u>, <u>Twombly</u>, and <u>Nemet Cheverolet</u>. Therefore, <u>Wilar</u> is not helpful to the instant analysis.

In sum, plaintiff's claim for fraudulent inducement fails as a matter of law. Therefore, defendant's motion to dismiss is granted in this part and said claim is dismissed without prejudice.

15

4. Negligent Misrepresentation

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369 (2014). The claim requires "a false representation positively made by one who ought in the discharge of his duty to have known the truth and who is consciously and recklessly ignorant whether it be true or false." Atkinson v. Charlotte Builders, 232 N.C. 67, 68 (1950).

In addition to claim elements, "North Carolina's economic loss rule provides that 'ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.'" Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978)). "A tort action must be grounded on a violation of a duty imposed by operation of law, not a violation of a duty arising purely from the contractual relationship of the parties." Id. (quotations omitted). "Thus, a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted).

"Accordingly, North Carolina law requires' courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Id. (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998)). "Only where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 330 (4th Cir. 1994). In this manner, for example, a "defendant could counterclaim for fraud because the plaintiff not

only failed to complete work required under the contract (which was a breach of contract), but had no intention of doing so from the very beginning (which constitutes fraud)." Legacy Data Access, Inc., 889 F.3d at 166. By contrast, the Supreme Court of North Carolina has recognized "our research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." N. Carolina State Ports Auth., 294 N.C. at 83 (emphasis added); see also Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc., ___ N.C. ___, 2020 WL 7415061, at *5 (2020) ("North Carolina's state courts have consistently applied the economic loss rule to hold that purely economic losses are not recoverable under tort law, particularly in the context of commercial transactions.").

Here, in advancing a negligent misrepresentation claim, plaintiff asserts that defendant "had a duty to inform [plaintiff] if it was not willing or able to meet its contractual obligations to deliver the contracted goods within the promised timeframe." (Compl. ¶ 45) (emphasis added). The asserted basis for this duty, however, is co-extensive with defendant's contractual duty. In particular, plaintiff alleges the following regarding the formation of the parties' agreement:

> Defendant, by and through its assistant sales manager [Alexeeva] and its sales supervisor [Ibia-Bronaugh], assured plaintiff that it had sufficient inventory and could [1] completely supply plaintiff's requirement of 1.9 million two-ounce bottles and the corresponding pump spray lids [2] over the course of four weeks. Defendant agreed [1] to be an exclusive supplier to plaintiff of these 1.9 million bottles, to set aside that quantity of bottles specifically and solely to supply to plaintiff, and [2] to deliver to plaintiff 480,000 bottles each week until a total of 1.9 million bottles had been delivered. In exchange for the exclusive and guaranteed availability and delivery of those bottles in weekly installments over the course of four weeks, plaintiff agreed to pay 50% of the total purchase price as a deposit immediately, to submit a credit application to defendant, and to pay the balance of the account in accordance with industry standard NET30 terms. Defendant agreed to all of these terms.

As an initial matter, the representations regarding defendant's willingness to perform under the contract are not independent of the terms of the alleged contract, but are rather co-extensive with

17

the alleged terms of the contract itself. That is, the enumerated assurances at [1] and [2] in the quoted text above are simply restated in the enumerated promises [1] and [2] in the alleged contract.

In addition, the alleged representations regarding defendant's <u>capability</u> to perform under the contract became embodied in the terms of the contract. Thus, defendant's failure to perform the enumerated terms of the contract, "even though such failure was due to negligence or lack of skill," cannot form the basis for an independent tort claim. <u>N. Carolina State Ports Auth.</u>, 294 N.C. at 83 (emphasis added). Rather, plaintiff's remedy for defendant's alleged misrepresentation of its ability to perform the very terms of the contract which defendant allegedly breached, is through remedies in contract and not a tort claim for negligent misrepresentation.

Furthermore, and in the alternative, even if defendant owed a separate duty to represent its capability to perform the contract, plaintiff has not alleged sufficient facts permitting an inference that any statement made by defendant about its capability to perform was "false" or that defendant was "consciously and recklessly ignorant whether it be true or false." <u>Atkinson</u>, 232 N.C. at 68. Rather, plaintiff alleges that defendant "was <u>choosing to</u> fulfill orders from other customers first ahead of [plaintiff]," but that defendant "<u>would ship</u> to [plaintiff] the remainder of the contracted goods" only for "an additional price." (Compl. ¶¶ 18, 19) (emphasis added). There are no facts alleged that defendant was not capable of delivering the goods to plaintiff, but rather only facts that it was not willing to do so on the terms previously agreed.

The unpublished district court cases relied upon by plaintiff in support of its claim are instructively distinguishable. <u>In PCJ Franchising Co., LLC v. Newsome</u>, No. 7:08-CV-41-BO, 2008 WL 4772191 (E.D.N.C. Oct. 28, 2008), for example, the court relied upon a Federal Trade Commission rule that required franchisors to provide potential franchisees "with truthful, complete

and timely information on which they could rely in making a decision to purchase a franchise opportunity." Id. at 3. In addition, the information provided had nothing to do with the willingness or ability of the party to perform under the contract, as here, but rather "financial information for [the franchisor's] affiliates, which have a markedly more favorable financial structure than [the franchisor's] franchisees." Id. Thus, PJC Franchising Co. is distinguishable both in the source of duty owed and in the type of misinformation allegedly provided.

In Wilkins v. Wachovia Corp., No. 5:10-CV-249, 2011 WL 1134706 (E.D.N.C. Mar. 24, 2011), the court addressed claim of "fraud in the inducement," and did not provide a factual summary of plaintiff's claims alleged to be "grounded in defendants' conduct before executing [an] investment management agreement," except to state that "[t]he allegations are detailed and specific." Id. at *3. Wilkins, thus, is not helpful to the instant case, where the court's analysis depends on the type of misrepresentations asserted and the lack of factual allegations supporting intent or knowledge of falsity.

Finally, Wilar Enterprises, 2005 WL 8159397, discussed above with respect to plaintiff's fraudulent inducement claim, is inapposite because it does not discuss application of the economic loss doctrine, or related principles as summarized most recently by the Fourth Circuit in Legacy Data Access, Inc., 889 F.3d at 164. Moreover, the court in Wilar Enterprises determined under prior pleading standards that plaintiff had alleged that defendant "did not possess the time or skill to perform under the contract." 2005 WL 8159397 *4 (emphasis added). Furthermore, it was noted there that the quality of the product delivered by plaintiff was substantially lacking, in addition to the failure to meet deadlines. See id. ("Defendant never completed the website [as contracted], and left it in such a state that even if it were to be completed it would not be able to

handle plaintiff's online sales.").  Plaintiff does not plead such allegations in the instant complaint

under the pleading standard required by Iqbal and Twombly.  (See, e.g., Compl. ¶¶ 11-13, 18-21).

In sum, plaintiff's claim for negligent misrepresentation fails as a matter of law.  Therefore,

defendant's motion to dismiss is granted in this part and said claim is dismissed without prejudice.

5.      UDTPA

Where plaintiff's fraud and negligent misrepresentation claims fail as a matter of law, and

where plaintiff's UDTPA is based upon the same asserted conduct, (see Compl. ¶ 59; Pl's Opp.

(DE 18) at 24 (stating "[t]his claim rises and falls with [plaintiff's] tort claims"), plaintiff's UDTPA

claim also fails as a matter of law. See SciGrip, Inc. v. Osae, 373 N.C. 409, 427 (2020) ("[A]n

intentional breach of contract, standing alone, simply does not suffice to support the assertion of

an unfair and deceptive trade practices claim.");  Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90,

97 (1985) ("Proof of fraud necessarily constitutes a violation of the prohibition against unfair and

deceptive acts."); Broussard, 155 F.3d at 347 (stating that "substantial aggravating circumstances"

are required for a claim under the UDTPA); Ellis v. Louisiana–Pac. Corp., 699 F.3d 778, 787 (4th

Cir.2012) ("Egregious or aggravating circumstances must be alleged before the provisions of the

[UDTPA] may take effect.") (citation omitted).

Therefore, defendant's motion to dismiss is granted in this part, and plaintiff's UDTPA

claim is dismissed without prejudice.[3]

4.      Breach of Covenant of Good Faith and Fair Dealing

Defendant argues that a claim for breach of covenant of good faith and fair dealing cannot

be pleaded separately in addition to plaintiff's breach of contract claim.

---

[3]      Defendant also moves to dismiss plaintiff's assertion of punitive damages.  "According to well-established
North Carolina law, punitive damages may not be awarded based upon the breach of a contract in the absence of the
commission of an identifiable tort." SciGrip, Inc. v. Osae, 373 N.C. 409, 428 (2020).  Therefore, where plaintiff's tort
claims have been dismissed, plaintiff may not assert punitive damages.

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985) (quotations omitted). The duty encompasses an "implied[] promise not to do anything to the prejudice of the other inconsistent with their contractual relations." Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 363 (1959). At the same time, however, "an express contract precludes an implied contract with reference to the same matter." Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713 (1962).

Thus, "an asserted implied term cannot be used to contradict the express terms of a contract." Hancock v. Americo Fin. Life & Annuity Ins. Co., 378 F. Supp. 3d 413, 431 (E.D.N.C. 2019). An implied duty of good faith in a contract "is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 184 (4th Cir. 2000). "An implied duty is simply a recognition of conditions inherent in expressed promises." Id. Accordingly, a claim for "breach of the covenant of good faith and fair dealing is part and parcel of [a] claim for breach of contract." Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000).

Based on the foregoing, although plaintiff pleads a separate enumerated claim for breach of implied covenant of good faith and fair dealing, this is not a claim that can exist independently of a breach of contract claim. Rather, it is properly construed as an alternative part of, or a component of, a claim for breach of contract. Moreover, plaintiff bases its breach of implied covenant claim, in part, on "[d]efendant's misrepresentations which induced [plaintiff] to enter into a contract with [d]efendant based on false premises." (Compl. ¶¶ 54-55). In that part, plaintiff's breach of implied covenant claim must be dismissed consistent with the court's

dismissal of plaintiff's tort claims. In remaining part, however, the claim may proceed forward so construed and limited.

Therefore, defendant's motion to dismiss plaintiff's breach of implied covenant claim is granted in part and denied in part.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 13) is GRANTED IN PART and DENIED IN PART, and plaintiff's motion to strike (DE 21) is DENIED AS MOOT. Plaintiff's claims for fraudulent inducement (second claim), negligent misrepresentation (third claim), and unfair and deceptive trade practices (fifth claim), are DISMISSED WITHOUT PREJUDICE. Plaintiff's claims for breach of contract (first claim) and breach of implied covenant of good faith and fair dealing (fourth claim) may proceed as construed and limited herein, without damages for unjust enrichment and punitive damages.

The court LIFTS the stay entered June 16, 2020, and an initial order regarding planning and scheduling shall follow, including direction for conduct of Rule 26(f) conference and filing of joint report and plan by the parties. In anticipation thereof, and in light of the procedural posture of this case, the court DIRECTS the parties to include in their Rule 26(f) conference, and corresponding joint report and plan, discussion of whether the parties wish to set aside time in the schedule of the case at this juncture for early alternative dispute resolution, in lieu of entry of a case management order governing completion of discovery and additional motions practice. Thereupon, the court will make such further order regarding scheduling as is warranted.

SO ORDERED, this the 22nd day of December, 2020.

LOUISE W. FLANAGAN
United States District Judge

22